**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DEANA KASEL,

     Plaintiff,

vs.

ZIMMER HOLDINGS, INC., a Delaware corporation, and
ZIMMER, INC., a Delaware corporation,

     Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Deana Kasel (hereinafter referred to as "Plaintiff"), an individual, files this Complaint seeking judgment against Defendants Zimmer Holdings, Inc. and Zimmer, Inc. (hereinafter referred to as "Defendants" or "Zimmer") and alleges upon personal knowledge and information and belief:

### INTRODUCTION

1.    This product liability action relates to the design, development, manufacture, testing, marketing, promotion, distribution, and sale of Zimmer's defective hip implant component known as the Durom® Acetabular Component (also referred to as the "Durom® Hip Cup").

2.    The Durom® Hip Cup was surgically implanted in Plaintiff Deana Kasel on or

about March 19, 2007.  Plaintiff continues to suffer pain and discomfort that significantly limits her ability to perform basic day-to-day functions and activities.

3.      Zimmer, founded in 1927, is one of the leading competitors in the U.S. hip and Knee replacement market and accounted for seventy percent (70%) of the market in 2008.

4.      In 2008, the U.S. hip and knee replacement market was valued at $6.7 billion dollars ($6,700,000,000.00), with the hip replacement market contributing to thirty-eight percent (38%) of the market at roughly $2.5 billion dollars ($2,500,000,000.00).  According to Zimmer's 2008 Annual 10-K Report, Zimmer was number one in global market share for reconstructive hip components.  In the period ending December 2008, Zimmer reported approximately $1,279,500 million ($1,279.500.00) in hip component sales.  Zimmer's total 2008 sales exceeded $4 billion ($4,000,000,000.00).

5.      Zimmer designs, develops, manufactures, markets, tests, distributes and sells reconstructive orthopedic implants, including joint, dental and spinal implants, trauma products and related orthopedic surgical products.  Zimmer's related orthopedic surgical products include surgical supplies and instruments designed to aid in orthopedic surgical procedures.  Zimmer also has a limited array of sports medicine products.  Zimmer's primary customers include musculoskeletal surgeons, neurosurgeons, oral surgeons, dentists, hospitals, distributors, healthcare dealers and, in their capacity as agents, healthcare purchasing organizations or buying groups. These customers range from large multi-national enterprises to independent surgeons.

6.      Zimmer's Durom® Hip Cup is an orthopedic device used in total hip replacement surgeries.  Total hip replacement surgery, also known as hip arthroplasty, is a surgical procedure in which the patient's hip joint is resurfaced and replaced with an artificial implant.  It is

typically used to repair joint/bone damage or to treat arthritis pain in the hip joint area.  The hip

joint is in essence a large ball-and-socket joint composed of two parts: the head of the thighbone,

or femur; and the acetabulum, a cup-shaped bone in the pelvis.  Therefore, total hip replacement

surgery traditionally consists of two tasks: (1) replacing the end of the femur, or thighbone, with

an artificial "ball," typically made of metal or stainless steel; and (2) resurfacing the hip socket

using a metal shell and plastic liner, into which the ball attached to the femur will fit.

7.    During hip replacement surgery, damaged portions of the hip are replaced with

smooth, durable artificial surfaces to allow the joint to function properly.  The Durom® Hip Cup

is not cemented or screwed in place during implantation.  Instead, it was designed to bond to the

patient's hip bone.  The outside of the Durom® Hip Cup is porous, and has been sprayed with a

highly engineered substance that is intended to facilitate the cup's acceptance by the human

body.  It is purportedly intended that the patient's own bone will grow into the exterior shell of

the cup.  This bone in-growth into the porous shell is what is intended to hold the cup in place.

8.    Rather than functioning in the intended manner, the Durom® Hip Cup resists

bone growth and as a result, instead of adhering to the bone, it comes loose and/or pops free from

the hip, which can cause damage to the pelvic bone.  This unintended result causes extreme and

devestating pain and often necessitates revision surgery to remove the failed Durom® Hip Cup

and replace it with a product that functions properly.

9.    The Durom® Hip Cup is part of a metal-on-metal hip implant system, which was

widely sold as being more durable, especially in young and active patients, like Plaintiff.

10.    According to an article published in the New York Times, on or about Thursday

March 4, 2010, entitled, "Concern Over Metal-on-Metal Implants", "studies in recent years indicate that in some cases the devices can quickly begin to wear, generating high volumes of metallic debris that is absorbed into a patient's body.  That situation can touch off inflammatory reactions that cause pain in the groin, death of tissue in the hip joint, and loss of surrounding bone."

11.     The suspension of the sales of the Durom® Hip Cup, announced on or about July 22, 2008, affects thousands of patients.  The Durom® Hip Cup has been implanted in over twelve thousand (12,000) patients in the United States since it was first sold on the U.S. market in 2006.

12.     When introducing the Durom® Hip Cup, Zimmer represented that the Durom® Hip Cup would provide greater range of motion and less wear on the bearing than traditional hip replacement implant components, thus making it an idea product for younger, active patients. Contrary to Zimmer's representations, the Durom® Hip Cup is prone to an unprecedented failure rate for hip replacement implant components.

13.     Since Defendants first began selling the Durom® Hip Cup in the United States in 2006 through on or about July 22, 2008, the product labeling and product information for the Durom® Hip Cup failed to contain adequate information, instructions and warnings concerning implantation of the product and the risks that the Durom® Hip Cup can loosen and separate from the acetabulum (hip socket) in patients.

14.     Despite their knowledge of the serious injuries associated with the use of the

Durom® Hip Cup, Defendants engaged in a marketing and advertising program which, as a whole, by affirmative and material misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of the Durom® Hip Cup was safe.

15.    At all relevant times, Defendants knew or should have known that the Durom® Hip Cup was not safe for the patients in whom it was implanted, including Plaintiff, because of the unacceptable failure rate, which is approximately twenty-four percent (24%), according to one leading orthopedic surgeon.

16.    Notwithstanding the knowledge of predicted failures with the defective Durom® Hip Cup, Defendants continued to sell the Durom® Hip Cup for implantation in patients until or about July 22, 2008, when Zimmer announced a suspension of the sale and distribution of the Durom® Hip Cup.

17.    Plaintiffs and patients in whom the Durom® Hip Cups remain implanted not only have suffered physical injuries, they also bear an unacceptable increase in the risk of severe pain and disability, with or without a costly and painful revision surgery. The revision surgery is invasive and painful and is often needed to replace the defective Durom® Hip Cup.

## PARTIES

18.    Plaintiff Deana Kasel is a resident and citizen of Fort Collins, Colorado, located in Larimer County.

19.    Defendant Zimmer Holdings, Inc. is a Delaware corporation with its principal place of business at 345 East Main Street, Warsaw, Indiana 46580-2746. Zimmer Holdings, Inc.'s registered agent for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

20.     At all relevant times, Zimmer Holdings, Inc. was the publicly traded holding company with wholly owned subsidiaries that it controlled, which designed, manufactured, marketed, supplied and sold to distributors, physicians, hospitals, patients and medical practitioners certain hip socket devices known as the Durom® Hip Cup to be surgically implanted in patients throughout the United States, including the State of Colorado.

21.     At all relevant times, Defendant Zimmer Holdings, Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly, through third parties or related entities, numerous orthopedic products, including the Durom® Hip Cup.  At all times relevant, Zimmer Holdings, Inc. conducted regular and sustained business in Colorado by selling and distributing its products in Colorado and engaged in substantial commerce and business activity in Colorado.

22.     Defendant Zimmer, Inc. is a Delaware corporation with its principal place of business located at 1800 West Center Street, Warsaw, Indiana 46581-0708.  Zimmer Inc.'s registered agent for service of process is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

23.     At all times relevant, Zimmer, Inc. was a wholly owned subsidiary of Defendant Zimmer Holdings, Inc.  Defendant Zimmer, Inc. designed, manufactured, marketed, supplied and sold the Durom® Hip Cup to physicians, hospitals, and clinics to be surgically implanted in patients in the State of Colorado.

24.     At all relevant times, Defendant Zimmer, Inc. was engaged in the business of

designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly, through third parties or related entities, numerous orthopedic products, including the Durom® Hip Cup.  At all times relevant, Zimmer, Inc. conducted regular and sustained business in Colorado by selling and distributing its products in Colorado and engaged in substantial commerce and business activity in Colorado.

25.     At all times relevant, Defendants Zimmer Holdings, Inc. and Zimmer, Inc. developed, designed, manufactured, advertised, promoted, marketed, sold and/or distributed the Durom® Hip Cup throughout the United States, including the State of Colorado.

26.     At all times relevant, each of the Defendants was the representative, agent, employee, co-conspirator, servant, employee, partner, joint-venturer, franchisee, or alter ego of the other defendants and in doing the things alleged herein was acting within the scope of such authority, conspiracy, service, agency, employment, partnership, joint venture and/or franchise.

27.     At all relevant times, each of the Defendants and their directors and officers acted within the scope of their authority of each Defendant and on behalf of each other Defendant. During the relevant times, Defendants possessed a unity of interest between themselves and Zimmer exercised control over its subsidiaries and affiliates.  As such, each Defendant is individually, as well as jointly and severally, liable to Plaintiff for Plaintiff's injuries, losses and damages.

28.     Defendants Zimmer Holdings, Inc. and Zimmer, Inc. are collectively referred to herein as "Defendants" and/or "Zimmer."

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because

there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

30.     Venue in this action properly lies in the District of Colorado pursuant to 28 U.S.C. §§ 1391 (a) and (c), as a substantial number of the events, actions or omissions giving rise to Plaintiff's claims occurred in this District. At all times material hereto, Defendants conducted substantial business in the State of Colorado.

31.     Upon information and belief, at all relevant times, Defendants were present and transacted, solicited and conducted business in the State of Colorado through its employees, agents and/or sales representatives, and derived substantial revenue from such business.

32.     At all relevant times, Defendants placed the defective device into the stream of interstate commerce that was implanted in Plaintiff Deana Kasel.

33.     Defendants are conclusively presumed to have been doing business in the State of Colorado and are subject to Colorado's Long Arm Statue pursuant to Colo. Rev. Stat. § 13-1-124.

34.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within the United States and the State of Colorado.

35.     Plaintiff's damages in this matter accrued in the District of Colorado.

**TAG ALONG ACTION**

36.     This is a potential tag-along action and in accordance with 28 U.S.C. § 1407, it should be transferred to the United States District Court for the District of New Jersey for inclusion in *In re: Zimmer Durom Hip Cup Products Liability Litigation*, MDL 2158, before the Honorable Susan D. Wigenton.

## FACTUAL BACKGROUND

### Background on Hip Replacement Surgery & Hip Replacement Devices

37.     The human hip joint consists of two parts: a ball and a socket.  A portion of the pelvic bone forms a cup-shaped socket; the ball at the top of the thigh bone fits into it.  The ball is surrounded with cartilage which, in a healthy hip joint, allows the ball to move smoothly within the socket.   Conditions such as osteoarthritis and avascular necrosis can cause degeneration of the hip joint such that hip replacement is required.

38.     A hip implant is designed to replicate the human anatomy – that is, the relatively simple ball and socket structure of the human hip joint.  Total hip replacement surgery involves implanting an artificial ball and socket into the patient.

39.     The artificial hip implantation process requires a surgeon to insert a metal cup with a smooth lining in the patient's diseased pelvic socket.  The lining serves the same purpose as natural cartilage in that it allows for smooth movement of the ball portion of the thigh bone. The diseased or degenerated ball part of the thigh bone is then removed and replaced by a metal or sometimes ceramic ball mounted onto a thin metal stem.  The metal stem is then fit into the thigh bone.  Finally, the ball is placed securely into the pelvic socket that has been fitted with the artificial metal cup, where it should move easily, without friction or pain to the patient.

40.     Total hip replacement is most commonly used to treat joint failure caused by osteoarthritis.   Other indications include rheumatoid arthritis, avascular necrosis, traumatic arthritis, protrusion acetabula, certain hip fractures, benign and malignant bone tumors, arthritis associated with Paget's disease of the bone, ankylosing spondylitis and juvenile rheumatoid

arthritis.   The aims of the procedure are pain relief and improvement in hip function.   Hip replacement is usually considered once other therapies, such as pain medications, have failed.

41.      Total hip arthroplasty ("THA"), or total hip replacement, is a common medical procedure performed on more than 420,000 patients in the U.S. each year.   It is designed to help relieve pain and improve joint function in people with severe hip degeneration due to arthritis or trauma.   Traditional devices to replace degenerative hips utilize implantable metal or ceramic heads fitting into a modular metal-backed polyethylene bearing.   One concern that historically plagues successful THAs is the wear of the bearing.   As the THA becomes more common among younger patients who want to maintain a physically active lifestyle, alternative bearing surfaces such as cross-linked polyethylene, ceramic-on-ceramic and metal-on-metal have been developed to address the issue of wear.   The Durom® Hip Cup promised to offer an alternative surface that would resist wear and tear.

42.      The Durom® Hip Cup is a monoblock (constructed of a single piece of material) cup made of cobalt chromium (CoCr) alloy and is designed for use in combination with Zimmer's Metasul Metal-on-Metal Tribological Solution LDH (Large Diameter Heads) for THA.   The design and material of the Durom® Hip Cup are key elements to its intended stability, wear resistance, and bone sparing characteristics.   The Durom® Hip Cup has a pure titanium plasma-sprayed coating for fixation.   The coating on the Durom® Hip Cup sold in the United States has a different structure and is slightly thicker (0.1 mm) compared to the same products which were sold for use in patients outside the United States.

### History of the Durom® Hip Cup

43.      The Durom® Hip Cup was launched in Europe in 2003 for hip resurfacing.   Hip

resurfacing requires less bone removal then conventional THA, but necessitates a different surgical technique. The Durom® Hip Cup was made available in Canada and Australia in 2003, India and Korea in 2005, and Argentina in 2006.

44.     On or about December 19, 2005, Zimmer submitted a section 510(k) Premarket Notification of Intent (K053536) to the FDA to manufacture and market the Durom Acetabular Component and the Metasul LDH (Large Diameter Heads) devices to the public. Three months later, on March 19, 2006, the FDA cleared the device for marketing and distribution in the United States.

45.     The 510(k) approval process by the FDA is regarded as a simplified "me too" application process, which does not require extensive review and approval by the FDA. A 510(k) is a premarket submission made to the FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device that is not subject to premarket approval. Submitters simply must compare their device to one or more legally marketed devices (devices marketed prior to May 28, 1976) and make and support their substantial equivalency claims. The FDA does not perform 510(k) pre-clearance facility inspections and submitters may market the device immediately after 510(k) clearance is granted.

46.     In this instance, Zimmer submitted a simplified 510(k) application that compared the Durom® Hip Cup to earlier products called "predicate devices" manufactured by competitors. In its application, Zimmer described: "The proposed device has the same intended use, has similar performance characteristics, is manufactured from similar materials using similar processes, and is similar in design to the predicate devices."

47.     No clinical studies were conducted in connection with the submission of the

application for the Durom® Hip Cup.  As part of the application process, Defendants stated that

the "results of non-clinical analysis demonstrate that the device is safe and effective and

substantially equivalent to the predicate device (as implants)."  Further in their submission to the

FDA the Defendants repeat throughout that the Durom® Hip Cup is intended to be a device that

is simply similar to previously approved predicate devices.  Therefore, the FDA was persuaded

by Defendants that any additional review and investigation was unnecessary.

### Design and Manufacture of the Durom® Hip Cup

48.     The Durom® Hip Cup is a flattened hemisphere, which is meant to offer a great

range and freedom of movement.  With a constant wall thickness of 4 mm throughout all sizes,

the cup maintains an inner diameter as large as possible, while intended to maintain maximum

implant strength and minimum bone resection of acetabular bone mass.  A coating of pure

titanium using a plasma spray under vacuum and static load is applied to the outer surface, called

Porolock ™ Ti VPS.  The high carbon cobalt chromium (CoCr) alloy is produced by a forging

process, rather than a casting process.  This means that the size of block carbides is up to eight

times smaller compared to cast cobalt chromium (CoCr) prostheses.  The resulting lower surface

roughness was intended to lead to a lower wear rate when compared with cast cobalt chromium

(CoCr) alloys.

49.     Defendants failed to recognize the deficiencies of the Durom® Hip Cup  due to

poor and inadequate quality assurance procedures, including failure of Defendants to implement

appropriate physical, manual, x-ray, microscopic and other inspections of the Durom® Hip Cup.

Defendants failed to implement or utilize adequate safeguards, tests, inspections, monitoring and

quality assessments to ensure safety of the defective device.  At the time the devices were

manufactured and sold to patients, the devices were defectively manufactured and unreasonably

dangerous, and did not conform to the federal regulations subjecting patients to risks of injury.

50.     During the time Defendants manufactured the Durom® Hip Cup, inadequate

manufacturing processes led to material flaws in the quality systems at its manufacturing

facilities.

51.     During the course of manufacturing the Durom® Hip Cup, Defendants failed in

several ways, including, without limitation, by:

    a.   failing to conduct adequate mechanical testing on components, subassemblies

        and/or finished Durom® Hip Cup;

    b.   failing to test an adequate number of sample devices on an ongoing basis;

    c.   failing to take adequate steps to specifically identify failure modes with clarity

        and suggest methods to monitor, avoid, and/or prevent further failures;

    d.   failing to identify and/or note the significance of any testing that resulted in

        failure of the Durom® Hip Cup;

    e.   failing to take corrective actions to eliminate or minimize further failures of

        the Durom® Hip Cup;

    f.   failing to adequately explain performance specifications for the components,

        subassemblies, and finished Durom® Hip Cup;

    g.   failing to adequately explain or justify all test conditions and acceptance

        criteria for the Durom® Hip Cup;

    h.   failing to perform adequate testing in an environment that adequately

        simulated in vivo conditions; and, by

      i.    failing to perform adequate quality assurance testing before and after sterilization.

52.     Defendants failed to perform adequate testing of the Durom® Hip Cup, including its components and subassemblies, to ensure that the Durom® Hip Cup functioned properly during and after implantation.

53.     As a result of these manufacturing and quality control problems associated with the manufacture of the Durom® Hip Cup, the component was inadequately and defectively manufactured, making it adulterated and outside of the specifications expressly approved by the FDA.

### Durom® Hip Cup Defects Are Exposed by Leading Physicians

54.     After the FDA initially approved of the 510(k) application, Defendants began to aggressively market the Durom® Hip Cup to physicians.

55.     Relying upon Zimmer's representations, physicians began using the Durom® Hip Cup instead of other models. Reports of Durom® Hip Cup failures soon followed. It is now apparent that a significant percentage of the Durom® Hip Cups have failed, and that the failure rate is unacceptably high.

56.     The failure rate is estimated at upwards of twenty-four percent (24%) when analyzing patients over a four-year period (2006-2010). This failure rate is much higher than similar products manufactured by Defendants, and is also much higher than the failure rate of competitor's devices. Furthermore, this failure rate is four times greater than Defendants' predicted failure rate of 5.7%.

57.     Lawrence Dorr, M.D., a world-renowned orthopedic surgeon and Zimmer

consultant, and a team of doctors at The Arthritis Institute at Good Samaritan Hospital in Los Angeles, California, have recently published the results of their study comparing one hundred and eighty patients who had the large-diameter (44 to 50 mm) Durom® Hip Cup and fifty-four patients who had a small-diameter (28 mm Metasul®) articulation implanted between May 2006 and November 2007. The total number of clinical failures was forty-one of one hundred and eighty patients (23%). Twenty-eight of one hundred and fifty-one patients had radiographic impending failure at final follow-up (18.5%). All post-revision surgery retrieved cups were examined in detail and had no evidence of bone on the fixation surface.

58.     Since at least 2007, surgeons implanting the Durom® Hip Cup complained to Defendants that the device was failing in their patients, many of whom had to undergo painful, invasive and expensive revision surgeries.

59.     One of these surgeries was Dr. Dorr, who warned Defendants in 2007 of the high rate of Durom® Hip Cup failures. At the time Dr. Dorr warned Defendants of the high rate of failures, he was a veteran of thousands of hip replacement surgeries.

60.     In particular, Dr. Dorr informed Defendants that x-rays showed that the Durom® Hip Cup was failing because it was separating or loosening from the bone, rather than fusing to it, causing patients crippling pain as a result of the metal cup moving around the hip socket and rubbing against the bone.

61.     Defendants ignored Dr. Dorr's warnings and continued to sell the Durom® Hip Cup devices.

62.     In April 2008, Dr. Dorr publicly warned other orthopedists about the cup failures his patients were experiencing and urged Defendants to stop selling the Durom® Hip Cup.

63.     On April 22, 2008, Dr. Dorr wrote the following memorandum to his colleagues

at the American Association of Hip and Knee Surgeons:

> MEMO
> DATE: 4/22/08
> TO: American Association of Hip and Knee Surgeons
> FROM: Larry Dorr, M.D.
> RE: This NOTICE is to inform you that we have had ten revisions in 165 hips and
> have four more that need to be revised using the Durom cup (Zimmer, Inc.).
>
> This **failure rate** has occurred within the first two years. In the first year the x-rays
> looked perfect. We have revised four that did not have any radiolucent lines or
> migration (and John Moreland revised one). These early cups fooled us, but the
> **symptoms were so classic for a loose implant** that we operated the patients. When
> we hit on the edge of the cup **it would just pop free**. As time goes by the cups begin
> developing radiolucent lines. We now have one up at two years that has actually
> migrated a short distance. It has titled into varus. **We do not believe the fixation
> surface is good on these cups.** Also there is a circular cutting surface on the
> periphery of the cup that we believe **prevents the cup from fully seating. We
> stopped using the cup after the first revisions.**
>
> We have notified Zimmer. **The FDA has been notified** and we will notify them of
> our continued revisions. The company does not believe it should pull the cup from
> the market so I am notifying all of my colleagues of our failure rate with this cup. I
> went through a similar scenario with the Sulzer cup failures where I was the only one
> experiencing revisions at the beginning and basically it was assumed that it was our
> technique. **I can assure you that this goes beyond technique**. I learned my lesson
> in not informing everyone about **this magnitude of failures** with the Sulzer cup
> problem, so it is my obligation to do so with this cup.

(emphasis in original).

64.     After informing colleagues about his experience with the Durom® Hip Cup, Dr.

Dorr heard from several other doctors who reported similar problems. According to Dr. Dorr

and other physicians, x-rays of patients who received defective Durom® Hip Cups showed that

the socket was separating from the bone, rather than fusing with it.

65.     For patients, the slippage of the implant itself, as a result of its failure to adhere to

the bone meant agony as the metal cup moved around in the hip socket and rubbed against the bone.

66.     Despite this memorandum, Defendants ignored the warnings and continued to sell the Durom® Hip Cup.

67.     In late May 2008, Defendants finally informed surgeons that it was investigating Dr. Dorr's complaint, but it did not suspend sales, as Dr. Dorr had recommended.   While Defendants investigated complaints, roughly 1,300 more patients were implanted with the Durom® Hip Cup in the United States.

68.     Defendants responded by defending the Durom® Hip Cup and blaming the doctors' implantation techniques.  Defendants later attributed failures of the Durom® Hip Cup to a discrepancy in doctors' techniques in performing THA surgeries.  Defendants contended (and still contends) that the technology and design paramaters of the Durom® Hip Cup demand a surgical technique with "high precision and specificity compared to more common and familiar hip arthroplasty surgical techniques practiced in the U.S."  Therefore, according to Defendants, the Durom® Hip Cup requires additional training in implantation technique and cup placement for many surgeons who use the device and who may otherwise be experts in THA.

69.     Around this time, although Defendants still maintained that there were no issues with the Durom® Hip Cup, other doctors began to stop implanting them.  Even still, Defendants continued to market the Durom® Hip Cup to unsuspecting physicians and patients, selling hundreds of units between May 2008 and July 22, 2008.

70.     Throughout 2008, while the Durom® Hip Cup was being implanted in patients

across the United States and around the world, Defendants were accumulating mounting and overwhelming reports that the Durom® Hip Cups were failing at an alarming and undisclosed rate.

### Temporary Suspension of the Durom® Hip Cup

71.     Defendants continued to sell the Durom® Hip Cup for implantation in patients until July 22, 2008, when Defendants announced it was temporarily suspending the Durom® Hip Cup from marketing and distribution in the United States.  In its announcement, Defendants stated that the suspension was necessary "while the Company updated labeling to provide more detailed surgical technique instructions to surgeons and implements its surgical training program in the U.S."

72.     Defendants announced that the company was taking this "voluntary action to address its concerns regarding reports of cup loosening and revisions of the acetabular component used in total hip replacement procedures," but that Zimmer "has found no evidence of a defect in the materials, manufacture, or design of the implant."

### Zimmer's Improper Failure to Recall the Durom® Hip Cup

73.     Under federal regulations, a recall is "a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure."  A recall is an effective method of removing or correcting consumer products that are in violation of laws administered by the FDA.

74.     These sections also recognize that recall is an alternative to an FDA-initiated

court action for removing or correcting violative, distributed products by setting forth specific recall procedures for the Food and Drug Administration to monitor recalls and assess the adequacy of a firm's efforts in recall.  A company's voluntary recall of a medical device and the FDA's classification of that action as a Class I recall establishes that the device violates FDA regulations.

75.     To date, Defendants have not issued a public recall of the Durom® Hip Cup and instead has described its action as only a "temporary suspension" of the device.  In reality, Zimmer has made the device "unavailable for purchase in the United States," (as found on the screen shot from Zimmer's e-catalog as published on Zimmer's website on February 23, 2010), but has not voluntarily recalled the device.

### Plaintiff's Injuries due to the Defective Durom® Hip Cup

76.     On or about March 19, 2007, Plaintiff Deana Kasel underwent a surgical procedure, a total hip replacement surgery of her right hip, performed at Poudre Valley Hospital in Fort Collins, Colorado.

77.     During the procedure on or about March 19, 2007, Plaintiff's surgeon implanted the Durom® Hip Cup, Reference Number 01.00214.152, Lot Number 2350711.

78.     After the hip replacement surgery, Plaintiff experienced pain and discomfort, which became progressively worse over time, as a proximate and direct result of being implanted with the Durom® Hip Cup, which was designed, developed, marketed, advertised and distributed by Defendants herein.

79.     In reliance on Zimmer's marketing of the Durom® Hip Cup, Plaintiff

Deana Kasel and her physician expected that this device would provide her with better stability and range of motion than other hip replacement devices on the market. In addition, Plaintiff expected a significant improvement in her quality of life after the original hip replacement surgeries, which did not occur and continues to impact her emotionally.

80.     Plaintiff Deana Kasel continues to experience pain and discomfort and struggles with performing many basic daily activities.

81.     Plaintiff Deana Kasel is presently in pain and has been advised by her orthopedic surgeon that it is her decision as to when, and if, she will undergo revision surgery in order to remove and replace the Durom® Hip Cup in her right hip.

82.     The revision surgery will subject Plaintiff to further pain, suffering and emotional distress. It will require Plaintiff to refrain from all weight-bearing activity for a substantial period of time, incapacitating and disabling Plaintiff. The surgery, rehabilitation therapy, and other treatment necessitated by the harmful effects of the Durom® Hip Cup will further result in Plaintiff's ongoing expense of money to obtain treatment, all with attendant pain, suffering, emotional distress and interference with Plaintiff's daily activities and occupations, all of which is or may be permanent.

83.     Plaintiff did not know, nor could Plaintiff have reasonably discovered through the use of reasonable diligence, that the prostheses Plaintiff was implanted with during her March 19, 2007 surgery was the Durom® Hip Cup until less than one year from the date of filing this action.

84.     Prior to Plaintiff being implanted with the Durom® Hip Cup, Defendants knew

or should have known that the Durom® Hip Cup was defective, prone to a high failure rate, and dangerous to consumers.

85.     Despite the fact that Defendants knew or should have known of the serious health risks associated with the Durom® Hip Cup, Defendants failed to warn Plaintiff and/or Plaintiff's health care providers of said serious risks before Plaintiff underwent hip replacement surgery where the Durom® Hip Cup was implanted.

86.     Had Plaintiff and/or Plaintiff's health care providers known the risks and dangers associated with the Durom® Hip Cup, the Durom® Hip Cup would not have been used during Plaintiff's hip replacement surgery and Plaintiff would not have suffered the injuries alleged herein.

87.     As a direct and proximate result of Defendants' defective Durom® Hip Cup, Plaintiff has suffered and will continue to suffer injuries, including but not limited to, significant harm, conscious pain and suffering, physical injury, bodily impairment, disfigurement, loss of enjoyment of life, mental anguish and emotional distress.

88.     As a direct and proximate result of defendants' defective Durom® Hip Cup, Plaintiff has suffered and will continue to suffer pecuniary losses

## COUNT I
### STRICT PRODUCTS LIABILITY
### DEFECTIVE MANUFACTURING
### AS TO ALL DEFENDANTS

89.     Plaintiff hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

90.     Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of orthopedic devices, including the Durom® Hip Cup.

91.    Defendants manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce the Durom® Hip Cup, which was expected to and did reach the consumer, including Plaintiff, without any alterations or changes or adjustment to its mechanical function.

92.    At the time the Durom® Hip Cup was manufactured and sold to the Plaintiff by Defendants, it was defectively manufactured and unreasonably dangerous, it did not conform to the federal regulations subjecting users to risks of serious side effects, including, but not limited to, long-term complications, pain, additional surgeries, personal injuries, the need for corrective surgery and pain and suffering, as well as other severe and permanent health consequences which exceeded the benefits of the products, and for which other safer products were available.

93.    The Durom® Hip Cup manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, was defective in its manufacture and construction when it left the hands of Defendants in that it deviated from product specifications such that it was unreasonably dangerous to an ordinary user or consumer and posed a serious risk of injury and death.

94.    That Plaintiff's injuries resulted from the defective condition of Defendant's Durom® Hip Cup, the defective condition made the Durom® Hip Cup unreasonably dangerous, and the defective condition existed at the time the Durom® Hip Cup left the Defendants' control.

95.    That the Defendants could reasonably be expected to foresee, and be responsible for, injuries to persons who were injured as a result of the manufacturing defect in the Durom® Hip Cup.

96.    That Plaintiff is an individual to whom injury resulting from the defectively

manufactured Durom® Hip Cup is reasonably foreseeable and Plaintiff was using the Durom®
Hip Cup for its intended purpose.

97.     The Durom® Hip Cup is defectively manufactured because the foreseeable risks
of mechanical malfunction and failure outweigh the benefits associated with the Durom® Hip
Cup.

98.     The Durom® Hip Cup was designed and/or manufactured in a manner violative
of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*, and the Medical Devices
Amendment thereto (hereinafter "FDCA").  The facilities or controls used by Defendants in the
manufacture, packing, storage, or installation of the Durom® Hip Cup were not in conformity
with applicable requirements of the FDCA.

99.     Defendants knew or should have known of the manufacturing defects and the risk
of serious bodily injury that exceeded the benefits associated with the Durom® Hip Cup.

100.    Furthermore, the Durom® Hip Cup and its defects presented an unreasonably
dangerous risk beyond what the ordinary consumer would reasonably expect.

101.    The Durom® Hip Cup was defective due to inadequate warnings or instruction
because Defendants knew or should have known that the Durom® Hip Cup created a high risk of
bodily injury and serious harm.  Defendants failed to adequately and timely warn consumers of
this risk.

102.    The Durom® Hip Cup is inherently dangerous for its intended use due to a
manufacturing defect or defects and improper functioning.  Defendants are therefore strictly
liable to Plaintiff for their breach of duty to Plaintiff.

103.    As a direct and proximate result of Plaintiff's use of defendants' Durom® Hip

Cup as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered and will continue to suffer personal injuries, economic and non-economic damages.

104. Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, malice, willful and wanton conduct and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

**COUNT II**
**STRICT PRODUCTS LIABILITY**
**DESIGN DEFECT**
**AS TO ALL DEFENDANTS**

105. Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

106. Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of orthopedic devices, including the Durom® Hip Cup.

107. Defendants placed the Durom® Hip Cup into the stream of commerce in a defective and unreasonably dangerous condition, such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the Durom® Hip Cup.

108. The Durom® Hip Cup manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, were defective in design or formulation in that, when the device left the hands of Defendants, the foreseeable risks of the products exceeded the benefits associated with its design, or they were more dangerous than an ordinary consumer would expect, such that they were unreasonably dangerous to an ordinary user or consumer and posed a serious risk of injury and death.

109. The foreseeable risks associated with the design of the Durom® Hip Cup include, but are not limited to, the fact that the design of the Durom® Hip Cup is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

110. The Durom® Hip Cup was expected to and did reach Plaintiff without substantial change in condition. The Plaintiff used the Durom® Hip Cup without making any changes or alterations to the product. Plaintiff used the Durom® Hip Cup in a manner reasonably anticipated.

111. At the time the Durom® Hip Cup was manufactured and sold to the Plaintiff by Defendants, it was defectively manufactured and unreasonably dangerous, it did not conform to the federal regulations subjecting users to risks of serious side effects, including, but not limited to, long-term complications, pain, additional surgeries, personal injuries, the need for corrective surgery and pain and suffering, as well as other severe and permanent health consequences which exceeded the benefits of the products, and for which other safer products were available. This defective condition made the product unreasonably dangerous when put to the reasonably anticipated use for which the Durom® Hip Cup was advertised.

112. The Durom® Hip Cup was designed and/or manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*, and the Medical Devices Amendment thereto (hereinafter "FDCA"). The facilities or controls used by Defendants in the manufacture, packing, storage, or installation of the Durom® Hip Cup were not in conformity with applicable requirements of the FDCA.

113. The Durom® Hip Cup manufactured and/or supplied by Zimmer was defective

due to inadequate warnings and/or inadequate trials, testing and study, inadequate exposure of the real risks inherent with the drug as determined by the clinical trials, and inadequate reporting of the results of the clinical trials and post-marketing clinical experiences with the device.

114.   The Durom® Hip Cup manufactured and/or supplied by Zimmer was defective due to inadequate post-marketing warnings or instructions because, after Zimmer knew or had reason to know of the risk of injury from the Durom® Hip Cup, it failed to provide adequate warnings to the medical community, patients and the public, including Plaintiff, and continued to promote and advertise the Durom® Hip Cup as safe and effective.

115.   The Durom® Hip Cup was designed, manufactured, distributed, tested, sold, marketed, and advertised defectively by Zimmer.  As a direct and proximate cause of Zimmer's defective design of the Durom® Hip Cup, Plaintiff and other patients had the device implanted in their bodies, and suffered and will continue to suffer increased risk of long-term complications and pain and additional surgeries, personal injuries, the need for corrective surgery and pain and suffering.

116.   Zimmer was or should have been in possession of evidence demonstrating that the Durom® Hip Cup caused serious injuries and would fail.  Nevertheless, Zimmer continued to market the device by providing false and misleading information with regard to the safety and efficacy of the Durom® Hip Cup.

117.   As a direct and proximate result of Plaintiff's use of the Durom® Hip Cup, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendants, Plaintiff suffered and will continue to suffer personal injuries, economic and non-economic damages, including pain and suffering.

118.    Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, malice, willful and wanton conduct and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

**COUNT III**
**STRICT PRODUCTS LIABILITY**
**DEFECT DUE TO INADEQUATE WARNING/FAILURE TO WARN**
**AS TO ALL DEFENDANTS**

119.    Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

120.    At all relevant times hereto, Defendants were engaged in the development, testing, manufacturing, marketing and sales of the Durom® Hip Cup devices.

121.    Defendants designed, manufactured, assembled and sold the Durom® Hip Cup devices to medical professionals and patients knowing that they would then be implanted in patients in need of hip prostheses.

122.    Defendants distributed and sold the Durom® Hip Cup devices in the condition they left their place of manufacture, in their original form of manufacture, which included the defects described herein.  The Durom® Hip Cup was expected to and did reach Plaintiff without substantial change or adjustment in its condition as manufactured and sold by Defendants.

123.    The Durom® Hip Cup devices designed, developed, tested, manufactured, marketed and sold or otherwise placed in the stream of commerce by Defendants were defective due to inadequate warning or instruction and was unreasonably dangerous to the ordinary user or consumer because Defendants knew or should have known that the products created significant

risks of serious bodily harm to users and consumers and they failed to adequately warn users and consumers and/or their health care providers of such risks.

124.    The Durom® Hip Cup devices manufactured and supplied by Defendants were defective due to inadequate post-marketing warning or instruction and were unreasonably dangerous to the ordinary user or consumer because, after Defendants knew or should have known of the risk of serious bodily harm associated with the Durom® Hip Cup, Defendants failed to provide adequate and timely warnings to users or consumers and/or their health care providers regarding the Durom® Hip Cup devices and their known defects. Defendants knew or should have known through testing, adverse event reporting, or otherwise, that the Durom® Hip Cup devices created a high risk of bodily injury and serious harm.

125.    The defect existed in the Durom® Hip Cup at the time it was purchased and implanted into Plaintiff. Plaintiff was and is in a class of persons that Defendants should have considered to be subject to the harm caused by the defective nature of the Durom® Hip Cup.

126.    The Durom® Hip Cup was expected to, and did, reach the usual consumers, handlers and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, tested, sold, distributed and marketed by Defendants.

127.    The Durom® Hip Cup was implanted, and used by the Plaintiff, in the normal manner for which it was intended.

128.    Plaintiff acting as a reasonably prudent person could not have discovered that the Durom® Hip Cup was defective, nor could she have perceived its danger.

129.    Defendants had a duty to create a product that was safe for its normal, intended

use.

130.   Defendants knew or should have known through testing, adverse event reporting, or otherwise, that the Durom® Hip Cup created a high risk of bodily injury and serious harm. Defendants failed to provide adequate and timely warnings or instructions regarding the Durom® Hip Cup and its known defects.

131.   Upon information and belief, sales and use continued after Defendants knew, or should have known that their product had a manufacturing and design defect and was functioning improperly, and therefore, presented risk of serious side effects including, but not limited to, long-term complications and pain and additional surgeries, personal injuries, the need for corrective surgery and pain and suffering, as well as other severe and permanent health consequences.   Therefore, Defendants are strictly liable in tort for the bodily injuries and damages suffered by Plaintiff.

132.   The Durom® Hip Cup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed by Defendants had a manufacturing and design defect and was functioning improperly, and was therefore, unreasonably dangerous, not reasonably safe, and did not meet reasonably consumer expectations because of design and manufacturing defects, use defects including inadequate warnings, and defects attributable to inadequate testing.   Therefore, Defendants are strictly liable in tort for the bodily injuries and damages suffered by Plaintiff.

133.   The Durom® Hip Cup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed by Defendants had a manufacturing and design defect and was functioning improperly, and was therefore, defective due to inadequate post-

marketing surveillance and/or warnings.  Therefore, Defendants are strictly liable in tort for the

bodily injuries and damages suffered by Plaintiff.

134.    As a direct and proximate result of Plaintiff's use of the Durom® Hip Cup,

as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce

by Defendants, Plaintiff suffered and will continue to suffer personal injuries, economic and non-

economic damages, including pain and suffering.

135.    Defendants' actions and omissions as identified in this Complaint show that

Defendants acted maliciously, with aggravated or egregious fraud, malice, willful and wanton

conduct and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of

punitive damages.

**COUNT IV**
**NEGLIGENCE**
**AS TO ALL DEFENDANTS**

136.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every

allegation set forth in the preceding paragraphs and further allege as follows.

137.    At all relevant times, Defendants had a duty and continue to owe a duty to

Plaintiff to exercise reasonable care in the design, manufacture, sale and/or distribution of the

Durom® Hip Cup into the stream of commerce, including a duty to assure that their products did

not pose a significantly increased risk of bodily harm and adverse events.

138.    At all relevant times, Defendants had a duty, and continue to owe a duty to

Plaintiff, to provide a safely manufactured product, to notify the FDA of flaws, and to warn the

FDA and Plaintiff of the defective nature of the Durom® Hip Cup.

139.    Defendants breached their duty of reasonable care to Plaintiff by failing to

exercise due care under the circumstances.

140.    Defendants breached their duty to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of the Durom® Hip Cup into interstate commerce in that Defendants knew or should have known that these products caused significant bodily harm and were not safe for use by consumers.

141.    Defendants breached their duty to exercise reasonable care to Plaintiff by defectively designing, manufacturing, and/or negligently failing to warn of these defects in the Durom® Hip Cup, thereby causing Plaintiff's injuries and damages.

142.    Defendants breached their duty to exercise reasonable care to Plaintiff by manufacturing and assembling the Durom® Hip Cup in such a manner that it was prone to failures and malfunction and thus exposed Plaintiff to severe and lasting physical trauma and injuries.

143.    Defendants breached their duty of reasonable care to Plaintiff by failing to promptly and adequately notify the FDA and warn and instruct Plaintiff, the medical community, and the public at the earliest possible date of known defects in the Durom® Hip Cup.

144.    Plaintiff and Plaintiff's healthcare providers reasonably relied to Plaintiff's detriment upon Defendants' misrepresentations and/or omissions in its design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution concerning the serious risks posed by the Durom® Hip Cup devices.

145.    Despite the fact that Defendants knew or should have known that the Durom®

Hip Cup posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Durom® Hip Cup for use by consumers.

146.     Defendants knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

147.     As a direct and proximate result of Defendants' negligence, Plaintiff suffered and will continue to suffer personal injuries, economic, and non-economic damages.

**COUNT V**
**BREACH OF EXPRESS WARRANTY**
**AS TO ALL DEFENDANTS**

148.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

149.     Defendants expressly warranted to Plaintiff by and through Defendants and/or their authorized agents and/or sales representatives, in publications, package inserts, the Internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that the Durom® Hip Cups were safe, fit, and effective orthopedic devices for those patients requiring a hip replacement and were proper for their intended use.

150.     In allowing the implantation of the Durom® Hip Cup, Plaintiff and her physician reasonably relied on the skill, judgment, representations and express warranties of Defendants. These warranties and representations were false in that the Durom® Hip Cup was not safe and was unfit for the uses for which it was intended.

151.     The Durom® Hip Cup devices manufactured and sold by Defendants did not

conform to the express warranties by Defendants because the product, as produced for public use, is defective and presents a high risk for injury to its intended user, including Plaintiff.

152.    Defendants breached their express warranty regarding the safety and fitness of the Durom® Hip Cup.

153.    As a direct and proximate result of Defendants' express breach of warranty, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

154.    Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, malice, willful and wanton conduct and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

### COUNT VI
### BREACH OF IMPLIED WARRANTY
### AS TO ALL DEFENDANTS

155.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

156.    Defendants impliedly warranted that the Durom® Hip Cup, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiff and her physicians, was merchantable and safe for ordinary use.

157.    Defendants further impliedly warranted that the Durom® Hip Cup, which Defendants designed, manufactured, assembled, promoted and sold to Plaintiff and her physicians, was fit for the particular purposes for which it was intended and was sold.

158.    Plaintiff and/or Plaintiff's physician reasonably relied upon the skill and judgment

of Defendants as to whether the Durom® Hip Cup was of merchantable quality and safe for her

intended use and upon Defendants' implied warranty as to such matters.

159.    Defendants breached this implied warranty because the Durom® Hip Cup

released for public consumption had manufacturing and design defects, functioned improperly,

and was not safe and fit for its intended purpose.

160.    Contrary to Defendants' implied warranty, the Durom® Hip Cup was defective,

unmerchantable, and unfit for its ordinary use when sold and unfit for the particular purpose for

which it was sold.

161.    As a direct and proximate result of Defendants' breach of implied warranty,

Plaintiff has suffered serious physical injury, harm, damages and economic loss and will

continue to suffer such harm, damages and economic loss in the future.

162.    Defendants' actions and omissions as identified in this Complaint show that

Defendants acted maliciously, with aggravated or egregious fraud, malice, willful and wanton

conduct and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of

punitive damages.

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**
**AS TO ALL DEFENDANTS**

163.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and

every allegation set forth in the preceding paragraphs and further allege as follows.

164.    At the time Defendants designed, manufactured, marketed, sold, and distributed

the Durom® Hip Cup for use by Plaintiff, Defendant knew or should have known of the use for which the Durom® Hip Cup was intended and the serious risks and danger associated with such use of the Durom® Hip Cup.

165.    Defendants owed a duty to users and consumers and/or treating physicians to accurately and truthfully represent the risks of the Durom® Hip Cup devices.   Defendants breached that duty by misrepresenting and/or failing to adequately warn Plaintiff's physicians, the medical community, Plaintiff and the public about the risks of the Durom® Hip Cup devices, which Defendants knew or in the exercise of diligence should have known.

166.    Plaintiff and/or Plaintiff's physician reasonably relied to their detriment upon Defendants' misrepresentations and omissions in their labeling, advertisements, and promotions concerning the serious risks posed by these products.   Plaintiff and/or Plaintiff's physician reasonably relied upon Defendants' representations that the Durom® Hip Cup devices were safe for use.

167.    As a direct and proximate result of Defendants' negligent misrepresentations and omissions applicable to the Durom® Hip Cup devices, Plaintiff used Defendants' Durom® Hip Cup and suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

168.    Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, malice, willful and wanton conduct and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

**COUNT VIII**
**INTENTIONAL MISREPRESENTATION**
**AS TO ALL DEFENDANTS**

169.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and

every allegation set forth in the preceding paragraphs and further allege as follows.

170.    Defendants, having undertaken to prepare, design, research, develop,

manufacture, insepct, label, market, promote and sell the Durom® Hip Cup, owed a duty to

provide accurate and complete information to Plaintiff, her physicians, and the public regarding

the Durom® Hip Cup.

171.    However, Defendants misled Plaintiff, her physicians, and the public into

believing that the Durom® Hip Cup was safe and effective for use in hip replacement surgery

and engaged in deceptive, misleading and unconscionable promotional and/or sales methods to

convince health care professionals and patients to use the Durom® Hip Cup, even though

Defendants knew or should have known that the Durom® Hip Cup was unreasonably unsafe.

Defendants also failed to warn health care professionals and the public about the safety risks of

the Durom® Hip Cup and the Metasul implant system they designed, marketed and sold.

172.    Defendants' advertising program and promotional items, by containing

affirmative misrepresentations and omissions, falsely and deceptively sought to create the image

and impression that the Durom® Hip Cup was safe for human use, had no unacceptable side

effects, and would not interfere with daily life.

173.    Defendants purposefully concealed, failed to disclose, misstated, downplayed, an

understated the health hazards and risks associated with the use of the Durom® Hip Cup.

Defendants, through promotional practices as well as the publication of medical literature,

deceived potential treating physicians, Plaintiff, other patients, and the public.  Defendants falsely and deceptively kept relevant information from potential treating physicians, the FDA and the general public, including Plaintiff, regarding the safety of the Durom® Hip Cup.

174.    Defendants expressly denied that the Durom® Hip Cup created an increased risk of injury and took affirmative steps to prevent the discovery and dissemination of any evidence on the increased likelihood of injury from the Durom® Hip Cup.

175.    Defendants did not accurately report the results of adverse events by fraudulently and intentionally withholding from the FDA, physicians, Plaintiff, and the public, the truth regarding Durom® Hip Cup failures for months, if not years, all the while undertaking a major advertising campaign to sell the Durom® Hip Cup.  Defendants received reports of the Durom® Hip Cup defects from various sources, including Dr. Dorr, and intentionally withheld this information, while continuing to sell the Durom® Hip Cup for implantation in individuals, including Plaintiff.

176.    Further, even as Defendants disclosed some information regarding the Durom® Hip Cup defects, the disclosures were incomplete and misleading.

177.    Defendants effectively deceived and misled the scientific and medical communities regarding the risks and benefits of the Durom® Hip Cup.  The truth did not begin to emerge until, at the earliest, May 2008, when Zimmer issued a "Dear Doctor" letter to physicians that suggested that Durom® Hip Cup defects were arising because of doctors' surgical techniques.  This letter was inadequate and failed to fully inform physicians, patients, including Plaintiff, and the public of the true defects in the Durom® Hip Cup, defects that were known to Defendants.  Even after the letter, Defendants' sale representatives continued to assure

physicians and patients that the Durom® Hip Cup was adequate and reliable for the purpose intended and continued to sell the Durom® Hip Cup.

178.   Through the materials they disseminated, Defendants falsely and deceptively misrepresented or omitted a number of material facts regarding the Durom® Hip Cup.

179.   Defendants possessed evidence demonstrating that the Durom® Hip Cup caused serious side effects.   Nevertheless, Defendants continued to market the Durom® Hip Cup by providing false and misleading information with regard to its safety to Plaintiff and Plaintiff's treating physicians.

180.   Defendants engaged in all the acts and omissions described above with the intent that Plaintiff's physician and Plaintiff would rely on the misrepresentation, deception, and concealment in deciding to use Defendants' Durom® Hip Cup rather than another Zimmer product or a competitors' similar product.

181.   Plaintiff and Plaintiff's physician justifiably relied to their detriment on Defendants' intentional and fraudulent misrepresentations as set out above.   This reliance proximately caused the injuries and damages described in this Complaint.

182.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff used Defendants' Durom® Hip Cup and suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

183.   Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously, with aggravated or egregious fraud, malice, willful and wanton conduct and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

## COUNT IX
## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
## AS TO ALL DEFENDANTS

184.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

185.    At all times relevant, the Colorado Consumer Protection Act, 6-1-105 C.R.S. et seq., (hereinafter "the Act") prohibits "the failure to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction" and declares such acts or practices as unlawful.

186.    Defendants violated the Act by the use of false and misleading misrepresentations or omissions of material fact in connection with the marketing, promotion and sale of the Durom® Hip Cup devices.  Defendants failed to disclose the serious and dangerous risks related to the use of the Durom® Hip Cup devices with the intent that consumers, like Plaintiff, and Plaintiff's healthcare provider would rely upon the omissions and misrepresentations and use the Durom® Hip Cup devices.

187.    As a result of violating the Act, Defendants caused Plaintiff and Plaintiff's healthcare provider to use the Durom® Hip Cup devices, causing severe injuries and damages to Plaintiff as previously described herein.

188.    As a result of Defendants' violation of the Act, Plaintiff seeks treble damages and costs as provided by the Act.

**COUNT X**
**PUNITIVE DAMAGES**
**AS TO ALL DEFENDANTS**

189.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

190.   The acts of Defendants were attended by circumstances of fraud, malice, or willful and wanton conduct, and showed a total disregard for human life and human suffering.

191.   Based upon the acts alleged herein, Defendants knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and damage, and defendants continued such conduct attended by circumstances of fraud, malice, or willful and wanton conduct, malice and/or in reckless disregard of the consequences, from which malice may be inferred.

192.   Plaintiff should be awarded punitive damages against Defendants, jointly and severally, based upon the acts herein so as to punish Defendants and deter similar conduct.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1. Compensatory damages in excess of the jurisdictional amount, including, but not limited to non-economic damages in excess of $75,000.00;

2. Medical expenses and other economic damages in an amount to be determined at trial of this action;

3. Attorneys' fees, expenses, and costs of this action;

4. Such further relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

By: ___ s/ Seth A. Katz _____
Seth A. Katz, Esq.
BURG SIMPSON ELDREDGE
HERSH & JARDINE, P.C.
40 Inverness Drive East
Englewood, CO 80112
Telephone: 303-792-5595
Facsimile: 303-708-0527
skatz@burgsimpson.com


Of counsel:

Roger C. Denton, Esq.
Kristine K. Kraft, Esq.
Ashley P. Brittain, Esq.
SCHLICHTER, BOGARD & DENTON
100 South 4th Street, Suite 900
Saint Louis, MO 63102
(314) 621-6115; fax (314) 621-7151
rdenton@uselaws.com
kkraft@uselaws.com
abrittain@uselaws.com

***Attorneys for Plaintiff***